4/16/02

**THIS DISPOSITION
IS CITABLE AS PRECEDENT
OF THE T.T.A.B.**

Hearing:                                          Paper No. 21
June 6, 2001                                       GFR

# UNITED STATES PATENT AND TRADEMARK OFFICE

_____

## Trademark Trial and Appeal Board

_____

The Sports Authority Michigan, Inc.

v.

The PC Authority, Inc.

_____

Opposition No. 113,785
to application Serial Nos. 75/289,273, filed May 9, 1997,
and 75/313,524, filed June 23, 1997

_____

R. Terrance Rader, Glenn E. Forbis and Kristin L. Murphy
of  Rader, Fishman & Grauer PLLC for The Sports Authority
Michigan, Inc.

Thomas J. Donovan, Sarah B. Knowlton and Mark A. Wright
of McLane, Graf, Raulerson & Middleton, P.A. for The PC
Authority.

_____

Before Simms, Wendel and Rogers,
Administrative Trademark Judges.

Opinion by Rogers, Administrative Trademark Judge:

Applicant The PC Authority, Inc. [PCA] has applied

to register the mark THE PERSONAL COMPUTER AUTHORITY and

the mark set forth below, each for services identified as

"retail stores featuring computer hardware and software,

computer accessories, computer networking products and peripheral devices," in International Class 35, and "consultation and design for others in the field of computer hardware and software, computer accessories, computer networking products and peripheral devices," in International Class 42.  Each application is based on an allegation of use of the applied-for mark in commerce, with June 30, 1995 asserted as the date of first use and first use in commerce.  The applications include, respectively, disclaimers of "Personal Computer" and "PC."



**THE PLEADINGS**

Registration of these marks has been opposed by The Sports Authority Michigan, Inc. [TSAM], under Section 2(d) of the Lanham Act, 15 U.S.C. §1052(d).  Opposer alleges there is a likelihood of confusion or mistake among consumers, or that they would be deceived, in view of opposer's (1) ownership of four incontestable registrations for AUTHORITY, THE SPORTS AUTHORITY, THE SPORTS AUTHORITY & design, and THE SKI AUTHORITY; (2)

opposer's "prior adoption, use and registration of use [sic]" of THE SPORTS AUTHORITY as a trade name; (3) opposer's "prior adoption and use of a family of marks dominated by the word 'AUTHORITY'"; and (4) opposer's "numerous" registrations for marks "dominated by the word 'AUTHORITY'," 35 of which are set forth by mark, registration number and class of goods or services in a chart in the notice of opposition.[1]  Opposer asserts that

---

[1] The registrations listed in the notice of opposition include the following, which we have listed by registration number, issue date, mark and goods or services with international classification.  (We have listed here only those registrations pleaded in the notice of opposition, by issue date from the oldest to the most recent, and corrected errors in opposer's chart.)

| | | | |
|---|---|---|---|
| 1,245,417 | July 12, 1983 | AUTHORITY | Apparel, namely, rainwear, jackets, coats, suits, slacks and vests (Cl. 25) |
| 1,527,526 | February 28, 1989 | THE SPORTS AUTHORITY | Retail store services featuring sporting equipment and clothing (Cl. 42) |
| 1,529,035 | March 7, 1989 | THE SPORTS AUTHORITY & Design | Retail store services featuring sporting equipment and clothing (Cl. 42) |
| 1,688,221 | May 19, 1992 | THE SKI AUTHORITY | Retail store services featuring ski equipment and clothing (Cl. 42) |
| 1,821,430 | February 15, 1994 | THE SPORTS AUTHORITY | Ladies apparel; namely shirts, and men's apparel; namely hats, visors, pants, shirts, shorts and swim trunks (Cl. 25) |
| 1,937,000 | November 21, 1995 | THE LOW PRICE AUTHORITY | Retail store services comprising the sale of sporting goods and equipment, footwear and clothing (Cl. 42) |

| 1,938,392 | November 28, 1995 | THE BAG AUTHORITY | Athletic bags, drawstring bags used for sleeping bags and floor mats, duffle bags and soft luggage (Cl. 18) |
|---|---|---|---|
| 1,963,911 | March 26, 1996 | THE KNIFE AUTHORITY | Retail store services featuring sporting goods and equipment, footwear and clothing (Cl. 42) |
| 1,999,520 | September 10, 1996 | THE CLUB AUTHORITY | Management of recreation and fitness clubs of others; and business consulting services relating to health, recreation and fitness clubs (Cl. 35) |
| 2,003,381 | September 24, 1996 | THE BICYCLE AUTHORITY | Repairs and maintenance of bicycles (Cl. 37). Retail store services in the field of bicycles and related accessories (Cl. 42) |

| 2,071,449 | June 17, 1997 | THE SPORTS AUTHORITY | Scorebooks, instruction guides and books in the fields of sports, exercise, fitness and recreation; clip boards; printed forms; printed matter, namely art pictures, art prints, bags for merchandise packaging, calendars, gift certificates, illustrations, price tags, and magazines in the fields of sports, exercise, fitness and recreation; score cards; stationery (Cl. 16). Bags for travel and sports (Cl. 18). Towels (Cl. 24). Clothing, namely shirts, tops, pants and shorts; headwear; hosiery; sweat bands (Cl. 25). Shoe laces (Cl. 26). Advertising for others; import-export agency; marketing research; purchasing agents; sales promotion for others; and promoting sports teams, competitions and events for others (Cl. 35). Sponsoring sports teams, competitions and events for others (Cl. 36). |
| --- | --- | --- | --- |
| 2,074,352 | June 24, 1997 | SHOE & APPAREL AUTHORITY | Retail store services in the field of sporting goods and equipment, apparel, footwear, headgear and related goods and services (Cl. 42) |
| 2,074,353 | June 24, 1997 | IN-LINE SKATE AUTHORITY | Retail store services in the field of sporting goods and equipment, apparel, footwear, headgear and related goods and services (Cl. 42) |

| 2,074,354 | June 24, 1997 | AUTHORITY | Retail store services in the field of sporting goods and equipment, apparel, footwear, headgear and related goods and services (Cl. 42) |
|---|---|---|---|
| 2,074,355 | June 24, 1997 | TEAM SPORTS AUTHORITY | Retail store services in the field of sporting goods and equipment, apparel, footwear, headgear and related goods and services (Cl. 42) |
| 2,074,356 | June 24, 1997 | FISHING AUTHORITY | Retail store services in the field of sporting goods and equipment, apparel, footwear, headgear and related goods and services (Cl. 42) |
| 2,074,357 | June 24, 1997 | HUNTING AUTHORITY | Retail store services in the field of sporting goods and equipment, apparel, footwear, headgear and related goods and services (Cl. 42) |
| 2,074,358 | June 24, 1997 | BASKETBALL AUTHORITY | Retail store services in the field of sporting goods and equipment, apparel, footwear, headgear and related goods and services (Cl. 42) |
| 2,074,359 | June 24, 1997 | GOLF AUTHORITY | Retail store services in the field of sporting goods and equipment, apparel, footwear, headgear and related goods and services (Cl. 42) |
| 2,074,782 | July 1, 1997 | SPORTS AUTHORITY FOOD, SPIRITS AND SPORTS & Design | Restaurant services (Cl. 42) |
| 2,076,213 | July 1, 1997 | OUTERWEAR AUTHORITY | Retail store services in the field of sporting goods and equipment, apparel, footwear, headgear and related goods and services (Cl. 42) |

| 2,076,214 | July 1, 1997 | TENNIS AUTHORITY | Retail store services in the field of sporting goods and equipment, apparel, footwear, headgear and related goods and services (Cl. 42) |
|---|---|---|---|
| 2,079,864 | July 15, 1997 | FITNESS AUTHORITY | Retail store services in the field of sporting goods and equipment, apparel, footwear, headgear and related goods and services (Cl. 42) |
| 2,079,866 | July 15, 1997 | HOCKEY AUTHORITY | Retail store services in the field of sporting goods and equipment, apparel, footwear, headgear and related goods and services (Cl. 42) |
| 2,079,867 | July 15, 1997 | MARINE AUTHORITY | Retail store services in the field of sporting goods and equipment, apparel, footwear, headgear and related goods and services (Cl. 42) |
| 2,082,095 | July 22, 1997 | EXERCISE AUTHORITY | Retail store services in the field of sporting goods and equipment, apparel, footwear, headgear and related goods and services (Cl. 42) |
| 2,082,096 | July 22, 1997 | FOOTWEAR AUTHORITY | Retail store services in the field of sporting goods and equipment, apparel, footwear, headgear and related goods and services (Cl. 42) |
| 2,082,097 | July 22, 1997 | RUNNING AUTHORITY | Retail store services in the field of sporting goods and equipment, apparel, footwear, headgear and related goods and services (Cl. 42) |
| 2,096,403 | September 16, 1997 | THE FITNESS AUTHORITY THE LAST WORD IN FITNESS & Design | Services rendered by health clubs (Cl. 41) |

TSAM licenses its parent company, The Sports Authority, Inc. to use TSAM's marks and registrations on or in connection with approximately 200 retail sporting goods stores spread among 32 states.  Opposer also asserts that

| 2,098,608 | September 23, 1997 | THE FITNESS AUTHORITY THE LAST WORD IN FITNESS & Design | Fitness apparel, namely sweatshirts, t-shirts and tank tops (Cl. 25) |
|---|---|---|---|
| 2,101,178 | September 30, 1997 | THE AUTHORITY ON SPORTING GOODS | Rental of sporting goods, including protective clothing and equipment (Cl. 41).  Retail store services in the fields of fitness, sporting goods and equipment, apparel, footwear, headgear and related goods (Cl. 42). |
| 2,102,208 | September 30, 1997 | THE SPORTS AUTHORITY | Computer services, namely interactive on-line publications in the fields of sporting goods and equipment, apparel, footwear, headgear and related goods and services (Cl. 42) |
| 2,108,004 | October 21, 1997 | THE SPORTS AUTHORITY LTD. | Retail store services in the fields of fitness, sporting goods and equipment, apparel, footwear, headgear and related goods (Cl. 35). Rental of sporting goods, including protective clothing and equipment (Cl. 41). |
| 2,141,699 | March 10, 1998 | AQUARIUM AUTHORITY | Retail store services featuring pet fish and aquatic supplies (Cl. 42) |
| 2,145,645 | March 24, 1998 | AQUARIUM AUTHORITY & Design | Retail store services featuring pet fish and aquatic supplies (Cl. 42) |

it is the largest full-line sporting goods retailer in the United States, marketing "hardline" items, "softline" items, and various services, both at retail and on a wholesale basis for use or resale by other enterprises. The goods and services, according to the notice of opposition, "have met with great commercial success and widespread consumer recognition"; and the marks and trade name used on or in connection with these have been used continuously since adoption. Opposer asserts that its marks have been advertised and promoted in such a manner as to establish the marks as a family of marks; and that its registrations for individual marks are valid and subsisting.[2]

Applicant has admitted opposer's allegations that applicant "is engaged in the customized retail and wholesale of personal computers and in computer

---

[2] In paragraph 6 of the notice of opposition, opposer asserts that its registrations have been issued by the United States Patent and Trademark Office "[i]n recognition of the valuable rights in and to Opposer's Marks, both individually and as a family of AUTHORITY Marks." While an issued registration carries certain evidentiary presumptions, there is no legal basis for opposer's suggestion that the Office has engaged in any valuation of the extent of opposer's rights in its registered marks or for the proposition that, in issuing registrations, the Office somehow has determined that opposer's marks constitute a family. We have accorded the registrations properly made of record the evidentiary weight to which they are entitled under the statute and have evaluated opposer's claim of the existence of a family of marks based on the evidence of record.

training"; that applicant's applications include disclaimers; and that opposer's registrations "issued." Applicant otherwise denies the salient allegations of the notice of opposition. In addition, applicant has asserted that the "use of the term 'AUTHORITY' cannot be distinctive or exclusive to the Opposer" in view of the number of registered marks including that term; that opposer "did not or could not oppose certain of these AUTHORITY-containing registrations/applications" and is "therefore barred by laches, acquiescence and estoppel" from contesting applicant's application; and that the respective customers of opposer and applicant "differ markedly" so that confusion is not likely.[3]

**THE RECORD**

The record consists of the pleadings; the files of the opposed applications; and a notice of reliance filed by each party.[4] Opposer's notice of reliance introduced

---

[3] Of these assertions, only applicant's assertion that the opposition is barred by laches, acquiescence and estoppel sets out the only true affirmative defenses. Applicant did not, however, submit evidence or argument in support of these defenses and we have not given them further consideration.

[4] Each party utilized its notice of reliance to, among other things, indicate its reliance on testimony it took during its main testimony period. Moreover, the parties stipulated that each could file its notice of reliance during its testimony period but could submit the exhibits introduced thereby after

10

the Fed. R. Civ. P. 30(b)(6) discovery deposition and

exhibits of Paul M. LaRochelle, applicant's president;

certified copies of 36 registrations for various marks of

opposer, each of which includes the term "Authority";

applicant's responses to opposer's first set of requests

for admissions; the trial testimony deposition of Michael

A. Lisi, senior vice president of opposer TSAM, and

exhibits; and the trial testimony deposition, with

exhibits, of Robert Meyers, the manager of THE SPORTS

---

the close of its testimony period.  It appears that one reason
they may have so stipulated was to allow each party additional
time to prepare the testimony transcripts and associated
exhibits therefor, prior to filing.
  The parties are reminded that trial testimony depositions are
noticed and taken during the party's assigned testimony period
but are not filed via notice of reliance.  Rather, the
transcript of a party's testimony deposition and associated
exhibits are served on the adverse party within 30 days of the
taking of the testimony and, following correction of any errors,
a certified transcript is filed with the Board, under cover of a
notice of filing, with proof of service thereof.  See Trademark
Rule 2.125, 37 C.F.R. §2.125.  For a discussion of the
requirement for serving an adversary with a transcript within 30
days, see TBMP §713.13.  For a discussion of filing with the
Board, see TBMP §§713.11 and 713.12.  In essence, so long as the
party's adversary is provided with its service copy within 30
days of the date of the testimony deposition, filing with the
Board may be made thereafter, without need for the parties to
enter into a stipulation to provide for filing outside the
testimony period.
  In contrast to the provisions of the rules that allow for
filing of parties' testimony deposition transcripts after their
respective testimony periods, notices of reliance must be filed
and served no later than the closing date of a party's testimony
period.  Notices of reliance -- a party is not limited to one --
are utilized to introduce a variety of non-testimonial evidence
and may be prepared whenever feasible prior to or during a
party's testimony period, but must be filed and served as noted.

AUTHORITY store in Manchester, New Hampshire, where applicant is located.  Opposer also introduced, during rebuttal, additional testimony of Mr. Lisi, with one exhibit.

Applicant's notice of reliance introduced the discovery depositions of Michael Lisi and Robert Meyers; copies of 41 third-party registrations retrieved from the Office's electronic records, each of which includes the term "Authority"; opposer's response to applicant's first set of interrogatories; the trial testimony deposition of Paul LaRochelle, and exhibits; and the trial testimony deposition of Clifford Sewing, and exhibits.

Certain comments are in order in regard to the record, even before consideration of the parties' objections to particular items of evidence.

First, each party has submitted discovery deposition transcripts in toto, i.e., has made no apparent effort to identify and introduce only those portions that are relevant to our determination of the pleaded claims. While not improper, it is more effective to file only those portions that are relevant and explain their relevancy in the notice of reliance.  See <u>Wear-Guard Corp. v. Van Dyne-Crotty Inc.</u>, 18 USPQ2d 1804, 1805 n.1

---

See Trademark Rules 2.120(j), 2.122(d)(2), and 2.122(e), 37

(TTAB 1990) (petitioner introduced selected portions of discovery depositions of registrant's witnesses), and Marion Laboratories Inc. v. Biochemical/Diagnostics Inc., 6 USPQ2d 1215, 1217 n.9 (TTAB 1988) (opposer introduced only portions of discovery deposition of applicant's president); see also, 37 C.F.R. §2.120(j)(4) in regard to adverse party offering additional portions necessary to ensure fairness.

Second, not one of the deposition transcripts, including those from discovery and testimony, has been signed by the witness, yet only some of the transcripts include references to signature requirements having been waived by agreement of the parties.  There having been no objections, however, in this regard, to any of the transcripts, they all have been considered.

Third, the parties have not been precise in the handling and submission of apparently confidential testimony and documents.  For example, whole transcripts of testimony depositions have been labeled as confidential when it is clear from reading the transcripts that only portions thereof were intended to be shielded from public view.  Also, each party has failed, in some respect, to submit under seal material it

---

C.F.R. §§2.120(j), 2.122(d)(2), and 2.122(e).

obtained during discovery and which was marked as confidential at the time of production.[5]  The parties are reminded that material should be designated as confidential, and as requiring handling as such, only when absolutely necessary.  A stipulated protective agreement may not be used as a means of circumventing relevant provisions of 37 C.F.R. §2.27, which provide, in essence, that trademark application and registration files, and related TTAB proceeding files, generally should be available for public inspection.[6]

**OBJECTIONS TO EVIDENCE, BY OPPOSER:**

---

[5] It is the parties' duty, under paragraph 12 of their stipulated protective agreement, to redact or segregate confidential information and submit it under seal.  Though the parties provided in paragraph 18 of their agreement that the Board "shall enforce the provisions" of the agreement, the Board does not actively monitor the efforts of parties to comply with such an agreement.  The agreement is for the benefit of the parties and it is the parties who are expected to abide by its terms.

Also, notwithstanding the provision to the contrary in paragraph one of the parties' protective agreement, the Board's jurisdiction over the parties ends when this proceeding does and the Board will not be involved in enforcing provisions of the agreement after conclusion of the opposition.

[6] Any exhibits to the parties' notices of reliance, including exhibits to discovery and testimony depositions, which have been clearly stamped "confidential," shall be segregated by the Board from the publicly available proceeding file.  The parties are allowed until 30 days from the date of this decision to submit a substitute for any filed deposition transcript which includes confidential testimony, replacing the pages containing the confidential material with blank numbered pages and placing the pages with confidential material in separate envelopes.

Opposer argues in its brief that "[d]espite TSAM's discovery requests related to third-party uses and the evidence that Applicant anticipated introducing at trial, Applicant failed to timely produce the documents in LaRochelle exhibits 17-19."[7] (TSAM brief p.35) Opposer has acknowledged that applicant did produce these documents, but only two weeks before the LaRochelle testimony deposition (LaRochelle test. p.70), and asserts that counsel for PCA "waited until after the discovery period closed to instruct" the witness to search for the documents and "waited until just before the testimony deposition" to produce them. (TSAM brief p.35)

PCA asserts that the production made before the deposition was not in response to discovery requests, because the documents did not exist during discovery and "were created in preparation for trial, and therefore, are covered by the work product doctrine." (PCA brief p.36) PCA also argues that the produced documents are publicly available web sites and opposer could have gotten them on its own. (PCA brief pp.36-37) Finally,

---

[7] We have not been provided with a copy of any discovery request by opposer that relates to third-party uses or evidence PCA planned to submit at trial. In its reply brief, however, TSAM quotes its interrogatory no. 13. That interrogatory requested PCA to identify third parties known to be using the term "Authority" in a mark or trade name.

PCA asserts TSAM "relied" on the disputed material at pages 6-7 and 17-23 of the Lisi rebuttal testimony deposition. The former two pages of testimony clearly relate to applicant's introduction of third-party registrations not web page evidence; but pages 17-23 do involve discussion of the probative value of the web material, insofar as the witness explains which purported uses he believes require opposer's intervention, which do not, and which present the term "Authority" in a different sense from the way in which it is used by TSAM.

We note that TSAM's real complaint appears to be that PCA did not indicate, when they were produced, that the documents "would be used at trial." (LaRochelle test. p.73) It is well settled, however, that in a Board proceeding a party need not specify, prior to trial, the evidence or witnesses it intends to present. See authorities collected at TBMP §419(7). Moreover, even if a party could be expected to make such specification in response to a discovery request, TSAM has not provided any proof that it served a discovery request seeking such.

Insofar as the produced documents would be considered responsive to TSAM's interrogatory no. 13, TSAM's only complaint can be that there was a delay in

16

production of the web material found by LaRochelle, for it is clear that PCA was under no obligation to search for third-party uses that would be responsive to the interrogatory.  See authorities collected at TBMP §419(9).  We see no evidence of undue delay.  The record reveals that discovery closed November 30, 1999; LaRochelle was instructed by counsel, by memo dated December 27, 1999, to search the web for uses of the term "Authority"; LaRochelle did some searching in January 2000; the web pages were printed out in March and April 2000 with the printed documents promptly produced to TSAM; and the deposition was held on May 3, 2000.  There is no evidence to support TSAM's contention that printing of the documents was intentionally delayed, so as to delay production.

TSAM's motion to strike LaRochelle exhibits 17-19 is denied.  We note, however, that our denial of the motion only means that the material is part of the evidentiary record.  The probative value of the material is a separate matter.

Opposer also objects to the entire testimony of Clifford Sewing as an "expert" who was not identified, i.e., an expert on the operation of BIG YELLOW, which is alleged to be an Internet search engine and "Bell

Atlantic's Yellow Pages on the internet." (LaRochelle test. p.101) TSAM has not, however, provided a copy of any interrogatory or other discovery request that called for PCA to identify experts it would depose at trial. While it is clear that the identity of an expert witness to be called at trial is discoverable, there is no automatic disclosure requirement in Board proceedings. Thus, in the absence of proof that TSAM requested PCA to identify its expert witnesses, we cannot say that PCA failed to do so. TSAM's argument that Sewing should have been identified in response to a discovery request calling for identification of "witnesses having knowledge relating to the opposition" (TSAM brief p. 36) fails for the same reason, i.e., we have not been provided with evidence of any such discovery request.

Finally, TSAM argues that the Sewing testimony is not relevant, since it does not cover issues related to likelihood of confusion and is limited to operation of BIG YELLOW. In this regard, PCA argues that the Sewing testimony is relevant because it authenticates and provides foundation for LaRochelle exhibits 18 and 19. (PCA brief p.38) PCA reasons that because the LaRochelle exhibits are relevant, so is the Sewing testimony "establishing the reliability of the [BIG YELLOW]

18

listings." (PCA Brief p.39)  We find the Sewing testimony relevant to the working of the search engine that was used by LaRochelle to produce LaRochelle exhibits 18 and 19, and deny TSAM's motion to strike the testimony.

**OBJECTIONS TO EVIDENCE, BY APPLICANT:**

Opposer pleaded ownership of 35 federal registrations, but attempted to introduce 36 into the record by its notice of reliance, and referenced 38 in its brief.  Applicant, in its brief, objects to one of the pleaded 35 (Reg. No. 2,071,449) as not having been properly proved by the TSAM notice of reliance, and objects to one of the three unpleaded registrations (Reg. No. 2,274,172) referenced in the brief as not properly proved. (PCA brief p.35)

Applicant's objection to TSAM's reliance, in its brief, on Reg. No. 2,274,172 is sustained, since the registration was not pleaded and its status and title have not been proved.  No consideration shall be given to that registration or to Reg. No. 2,282,414 which, likewise, was not pleaded or properly proved.

We also have disregarded Reg. No. 2,141,699 which, though pleaded, was not properly proved insofar as TSAM's notice of reliance includes only a plain copy thereof.

In contrast, we have considered Reg. No. 2,249,780 which was not pleaded but which was properly proved by submission of a certified copy showing status and title and to which PCA has made no objection.

As to the objection to Reg. No. 2,071,449, we note that this registration is, as illustrated by the charts in TSAM's pleading and brief, for the mark THE SPORTS AUTHORITY. Attached to TSAM's notice of reliance, in an attempt to prove status and title of the registration, is a certification sheet from the Office that certifies that the registration is subsisting and owned by opposer. However, attached to the certification sheet is a photocopy not of Reg. No. 2,071,4<u>4</u>9 for THE SPORTS AUTHORITY, but a photocopy of Reg. No. 2,071,4<u>9</u>9 for the mark QUAKER MAID. TSAM, with its reply brief, submitted a substitute certified copy with the appropriate photocopy, and explained that the Office had attached the wrong photocopy to the certification sheet submitted with TSAM's notice of reliance. We overrule applicant's objection to the proof of Reg. No. 2,071,449, and have considered it.[8]

---

[8] We note, too, that TSAM's witness Lisi testified to status and title of this and other registrations insofar as he identified and authenticated both a list of TSAM's "issued registrations" and photocopies of the listed registrations as members of the purported family of marks owned by opposer. Proof of the status

Applicant also objects to testimony of TSAM witness Lisi on state registrations, for which the only supporting evidence is a list introduced as Lisi exh. 32. PCA also argues that TSAM did not indicate its intent to rely on these registrations in its notice of reliance and, therefore, they are not properly of record. We overrule the objection to Lisi's testimony, and the accompanying exhibit. That official records, such as those which would prove the status and title of state registrations, may be made of record by notice of reliance does not render the Lisi testimony improper, though it has little, if any, probative value, especially since the exhibit is merely a list of these purported state registrations and we have not been provided with any copies of the individual registrations.

Applicant also objects to opposer's introduction in its brief of a "chart of its policing efforts," arguing that the exhibit cited as the source thereof does not exist and that the chart is different from both the chart produced in response to PCA's discovery requests and the chart discussed by TSAM witness Lisi. (PCA brief p.36)

---

and title of a registration may be made by direct testimony, as well as by submission, with a notice of reliance, of a copy prepared by the office showing status and title. See Trademark Rule 2.122(d)(2), 37 CFR §2.122(d)(2).

Opposer asserts that the chart in the brief is nothing more than a combination of (1) a chart produced to PCA during discovery and introduced into the record by PCA's notice of reliance on the Lisi discovery deposition, and (2) a chart discussed by Lisi during his testimony deposition. While we do not approve of opposer's methods[9], we overrule the objection insofar as we discern no prejudice to applicant by the reproduction in the brief of a chart combining other items properly made of record. To the extent the brief chart includes references to enforcement activities not reported in either of the other charts, such references have not been considered.

**THE PARTIES AND THEIR ACTIVITIES**

The record shows that opposer[10] was formed in 1987 and has expanded rapidly, especially during the mid-

---

[9] Applicant, aware of a prior, unrelated Board proceeding in which the Board criticized TSAM for relying in its brief on facts not in the record, cannot be faulted for its concern about the brief chart. To make clear that it was not attempting to introduce evidence of enforcement activity not in the record created at trial, opposer ought to have referenced the Lisi discovery deposition chart and Lisi testimony charts in a different manner. For example, opposer could have referenced one in its entirety and excerpts from the other, to paint a complete picture.

[10] Except as otherwise indicated, the term "opposer," as used in our discussion of what the record reveals about the parties, refers to TSAM, its parent The Sports Authority, Inc., and the

1990s.  It has a chain of approximately 200 large retail stores spread throughout 32 states, offers goods via catalogue, and has a web site which originally was only a source of information on opposer's stores and goods, but now is an additional sales outlet.  One of opposer's stores is located in Manchester, New Hampshire, where applicant's store is located, and another of opposer's stores is in Nashua, New Hampshire.  These stores opened, respectively, on November 11, 1993 and August 12, 1994.

Each of opposer's stores features up to 40,000 or more goods, including footwear, clothing (both for athletic and casual wear), "hardline" sporting goods (such as bicycles, golf, tennis, and hockey equipment), outdoor goods such as camping and fishing gear, and electronic items used in outdoor activities (such as two-way radios, global positioning systems, depth/fish finders) and indoors (such as computer games and heart-rate monitors).  In short, the testimony of TSAM witness Lisi, and exhibits thereto, demonstrate that opposer actually offers for sale the wide variety of items listed in the registrations referenced earlier in this decision.

Opposer advertises its stores in magazines and newspapers, on radio and television, on billboards, on

_____

various The Sports Authority stores run by TSAM, its parent or

other signs (such as on buses or at bus stops), via signs and sponsorship arrangements at numerous sporting events and venues where such events are held, and through cross-promotional advertising on various web sites other than opposer's own web site.  Most of its advertising dollars are spent on print ads in the locations in which opposer operates stores.  In its stores, opposer's core marks -- THE SPORTS AUTHORITY and THE SPORTS AUTHORITY logo -- are used in many ways, including on store signs, hang tags or stickers listing prices of merchandise, bags and boxes, business forms and receipts, and on employee apparel. Other marks in opposer's purported family, registered or unregistered, are used in varying degrees.[11]  In addition, the record reveals regular and widespread use of "www.thesportsauthority.com" to direct prospective customers to its web site.

Opposer is the largest sporting goods retailer in the United States and one of the top 50-100 retailers of all types.  Between 1987 and 1998, opposer's sales totaled more than $7.7 billion, with annual sales over a billion dollars a year from 1995 on.  Its advertising expenditures between 1988 and 1998 totaled nearly $335

---

by other licensees in Florida and Hawaii.
[11] These marks are referenced in our discussion, infra, regarding opposer's claim that it has a family of marks.

million; and expenditures in 1998 alone were nearly $70 million. Opposer's sales were, however, down in the first three quarters of its 1999 fiscal year and it closed some under-performing stores.

Applicant is a small business with one store located in Manchester, New Hampshire. Applicant adopted its marks and opened its store in June 1995, and has used its marks in the operation of the store since that time. Applicant is the successor to a sole proprietorship begun by Paul LaRochelle under the name Soft-Co. Soft-Co originally was a business run out of LaRochelle's home in Manchester and, for a time, an office in Bedford, New Hampshire. LaRochelle set out to find a new name in 1995, to coincide with a planned move of the business to the Manchester retail store.

Applicant is a "value-added" retailer involved in the sale and servicing of desktop computers, components, software and related peripherals; and offers training classes. Eighty percent of applicant's business is providing sales, service and training to other businesses, generally smaller businesses. Applicant does not sell off-the-shelf computers and builds computers and networks to meet the specifications and needs of its

customers. Walk-in business is a very small part of applicant's operation.

Applicant attends trade shows throughout the New England states, and considers the territory in which it does business to include New England, New York, Pennsylvania and sometimes other states. Its primary mechanisms for generating sales are the trade shows and direct sales efforts of its sales staff. Applicant sporadically places print advertising in a few newspapers in New Hampshire, primarily weeklies, but has placed ads in a daily also utilized by opposer, *The Union Leader* of Manchester, New Hampshire. At one point, applicant tried some cable television advertising. Bulk mailings are regularly used, employing lists developed by the sales staff or procured from elsewhere. At trade shows, applicant has given away promotional items, including coffee mugs, shirts, private-label root beer and certain computer accessories, such as mouse pads, all with the store's PC AUTHORITY & design mark on them. Once, applicant gave away a computer, printer and Internet service through a contest promoted on radio. Applicant also purchases display space in various Yellow Pages books. Its ad expenses for 1995 totaled approximately $20,000 and by 1999 its ad budget had grown to $75,000.

Applicant registered the mark THE PERSONAL COMPUTER AUTHORITY with the Secretary of State's Office in New Hampshire on June 1, 1995, but almost immediately employees, or at least LaRochelle, shortened the name and began answering the phone as "PC Authority," which applicant considers an abbreviated version of the mark registered with the Secretary of State.  Applicant's first trademark clearance searches for the two involved marks were conducted by counsel prior to filing of the involved applications.  Applicant uses its marks on store signage, both inside and out, banners displayed at trade shows, on a delivery truck, on bags used to package purchases in applicant's store, in its advertising and on its web site.  Whenever possible the marks are used together, but sometimes on hardware items, the only mark will be a one-inch-square sticker of the PC AUTHORITY logo.

**TSAM's CORE MARKS**

As we have noted, opposer's claim under Section 2(d) of the Lanham Act alleges there is a likelihood of confusion or mistake among consumers, or that they would be deceived, in view of opposer's (1) ownership of four incontestable registrations for AUTHORITY, THE SPORTS AUTHORITY, THE SPORTS AUTHORITY & design [hereinafter, the TSA logo], and THE SKI AUTHORITY; (2) opposer's "prior adoption, use and registration of use [sic]" of THE SPORTS AUTHORITY as a trade name; (3) opposer's "prior adoption and use of a family of marks dominated by the word 'AUTHORITY'"; and (4) opposer's "numerous" registrations for marks "dominated by the word 'AUTHORITY'."

The record developed by TSAM, the arguments in its briefs, and the arguments presented at the oral hearing all have focused on TSAM's THE SPORTS AUTHORITY mark and the TSA logo, and its claim that it has a strong, growing family of marks.[12] (TSAM notice of opposition ¶9) Moreover, putting aside for the moment the family of marks argument, it is clear from the record that TSAM's

---

[12] TSAM's fourth asserted basis for its Section 2(d) claim – its ownership of 35 registrations – has not been presented at trial as one which requires an analysis of the *duPont* factors with regard to each mark but, rather, as further evidence of TSAM's asserted family of marks.

strongest bases for its Section 2(d) claim are its prior use of THE SPORTS AUTHORITY as a trade name and its registration of both THE SPORTS AUTHORITY and of the TSA logo.  Accordingly, we focus our initial analysis on these and consider the family of marks argument separately.

Priority

The record clearly establishes opposer's prior use of THE SPORTS AUTHORITY as a trade name.  More importantly, since THE SPORTS AUTHORITY and the TSA logo have been registered as marks, and copies of these registrations showing status and title were submitted with TSAM's notice of reliance, priority is not an issue here.  See King Candy Co. v. Eunice King's Kitchen, 496 F.2d 1400, 182 USPQ 108 (CCPA 1974).

Likelihood of Confusion

The Court of Customs and Patent Appeals, the predecessor court of the Court of Appeals for the Federal Circuit, set out a non-exclusive list of thirteen factors to be considered when determining whether one mark is likely to cause confusion with another mark.  In re E.I. du Pont de Nemours & Co., 476 F.2d 1357, 1361, 177 USPQ 563, 567 (CCPA 1973).  While opposer asserts only six of

these factors are relevant in this case (TSAM brief p.25), we consider all 13.

(1) *The similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression.*

Opposer has a registration for THE SPORTS AUTHORITY in typed form, so there is no restriction as to its method of display as, for example, in a particular font or color.  It also has a registration for a logo, set forth below, and it is clear from the record that this is its most widely utilized form of presenting the words THE SPORTS AUTHORITY.



Applicant's mark THE PERSONAL COMPUTER AUTHORITY, like each of opposer's marks, begins with "The" and ends with "Authority."  Applicant's PC AUTHORITY logo does not use the term "The."  Each of opposer's registrations includes a disclaimer of the word "Sports"; applicant's respective applications include disclaimers of "Personal Computer" and "PC."

It is well settled that it is improper to dissect a mark, and that marks must be viewed in their entireties.

In re Shell Oil Co., 992 F.2d 1204, 1206, 26 USPQ2d 1687, 1688 (Fed. Cir. 1993).  However, more or less weight may be given to a particular feature of a mark for rational reasons.  In re National Data Corp., 753 F.2d 1056, 1058, 224 USPQ 749, 751 (Fed. Cir. 1985).  Opposer, because the involved registrations and applications all include disclaimers, focuses on the presence of "Authority" in each mark and argues that that is the dominant term in each mark.  To be sure, in terms of the capacity of each mark to indicate source, "Authority" must be considered the dominant element.  It need not automatically follow, however, that, merely because marks have the same dominant element, they are pronounced the same, look the same or present the same overall commercial impression.

Considered in their entireties, the involved marks would not be pronounced the same and do not look the same.  The connotations of the respective marks are similar only insofar as each conveys the sense that opposer and applicant are "authorities" in their respective fields; but the respective marks, particularly the respective logos, present "Authority" in smaller type and emphasize the field within which each party considers

itself an authority.[13]  In addition, opposer's goods and services, and its myriad sponsorship arrangements and advertisements at public arenas are inextricably associated with sporting activities, while applicant's goods and advertising are inextricably associated with personal computing and the Internet.  Thus, the specific commercial impressions created by the parties' respective marks are very different.  Opposer is the authority in sports; applicant is the authority in personal computing.

In sum, though the marks share a significant element, they look different, sound different and create different specific commercial impressions.

This factor favors applicant.

(2) *The similarity or dissimilarity and nature of the goods or services as described in an application or registration or in connection with which a prior mark is in use.*

In considering this factor in the analysis of likelihood of confusion, we must compare the goods and services as described in the involved applications and registrations.  Canadian Imperial Bank v. Wells Fargo

---

[13] As noted, opposer's logo is, as shown by the record, its most prominently featured mark in print advertising, on its website, on billboards and signs, etc.  Likewise, though applicant usually uses its two marks together, its logo is sometimes used alone, e.g., on its plastic shopping bag and on decals placed on computers; and when the marks are used together, e.g., on its store sign, the logo is the most visually prominent of the marks.

<u>Bank</u>, 811 F.2d 1490, 1493, 1 USPQ2d 1813, 1815 (Fed. Cir. 1987).

Opposer's two core marks are registered for "retail store services featuring sporting equipment and clothing." THE SPORTS AUTHORITY is also registered for various items of apparel, for both men and women, for "computer services, namely interactive on-line publications in the fields of sporting goods and equipment, apparel, footwear, headgear and related goods and services" and for the following:

> Scorebooks, instruction guides and books in the fields of sports, exercise, fitness and recreation; clip boards; printed forms; printed matter, namely art pictures, art prints, bags for merchandise packaging, calendars, gift certificates, illustrations, price tags, and magazines in the fields of sports, exercise, fitness and recreation; score cards; stationery (Cl. 16). Bags for travel and sports (Cl. 18). Towels (Cl. 24). Clothing, namely shirts, tops, pants and shorts; headwear; hosiery; sweat bands (Cl. 25). Shoe laces (Cl. 26). Advertising for others; import-export agency; marketing research; purchasing agents; sales promotion for others; promoting sports teams, competitions and events for others (Cl. 35). Sponsoring sports teams, competitions and events for others (Cl. 36).

Applicant seeks registration of its marks for "retail stores featuring computer hardware and software, computer accessories, computer networking products and

peripheral devices," and "consultation and design for others in the field of computer hardware and software, computer accessories, computer networking products and peripheral devices."

There is no similarity or relatedness whatsoever between applicant's services and the various classes of goods for which THE SPORTS AUTHORITY has been registered. Nor is there any similarity between applicant's services and opposer's various class 35 and class 36 services. As for opposer's "computer services," these are restricted to "on-line publications" focusing on the types of goods opposer sells and services it provides; and neither the on-line publications nor the goods or services discussed therein are anything like the computer hardware, software, peripherals and accessories that applicant sells at its store and over the Internet, or anything like the business consultation services applicant provides in the computer field. There is certainly no rule that all computer products and services are related. See In re Quadram Corp., 228 USPQ 863, 865 (TTAB 1985) ("[W]e think that a per se rule relating to source confusion vis-à-vis computer hardware and software is simply too rigid and restrictive an approach and fails to consider the realities of the marketplace"). See also

34

Electronic Design and Sales Inc. v. Electronic Data Systems, 954 F.2d 713, 21 USPQ2d 1388 (Fed. Cir. 1992) (No confusion between battery chargers and power supplies and computer services).

Opposer presses its argument that its retail store services involve selling computer games and some items of sporting equipment that include computer chips or may be used in conjunction with computers, such as a global positioning system that can be used by hunters, hikers and others engaged in outdoor activities and that can exchange information with a computer. There is no evidence in the record, however, to establish that such goods typically emanate from entities that retail computer hardware and software and provide computer consulting services. See Hasbro Inc. v. Clue Computing Inc., 66 F. Supp.2d 117, 122, 52 USPQ2d 1402, 1406 (D.Mass. 1999), aff'd, 232 F.3d 1, 56 USPQ2d 1766 (1st Cir. 2000), wherein the court held that it would be "an extraordinary stretch to assert that Hasbro's technical support to game users is similar in any meaningful way to the 'computer consulting services' provided by Clue Computing." See also, Falk Corp. v. Toro Manufacturing Corp., 493 F.2d 1372, 1378, 181 USPQ 462, 467 (CCPA 1974) (Court reversed Board decision sustaining opposition,

explaining that the opposer could not prevail merely on the ground that applicant's 'rubber element shaft couplings' might be contained in some of opposer's machines). Here, opposer cannot prevail merely because applicant sells computer parts and some computer parts may be contained in some of the electronic sporting goods and equipment sold by opposer.

In sum, we find no similarity or relatedness between the parties' respective goods and services. To the extent that they both are engaged in retail activities and may employ similar channels of trade and have some overlap in customers, these issues are considered under other duPont factors, not under the factor focusing on the similarity or relatedness of the goods and services.

This factor favors applicant.

(3) *The similarity or dissimilarity of established, likely-to-continue trade channels.*

Opposer argues, in essence, that the parties utilize the same trade channels, insofar as each runs retail stores, each uses the Internet, and they both use direct mail and other similar forms of print advertising. Opposer also relies on the fact that both parties sell goods at retail to general consumers. (TSAM brief p.32)

On this latter point, i.e., the retailing of goods to general consumers, this, of course, is not an issue in relation to applicant's business consultation services. In regard to applicant's retail store services, however, opposer is correct in arguing that both parties make their store services available to the same class of consumers, i.e., any potential consumer of their respective goods and services.  Applicant's witness LaRochelle testified at length about the vast majority of its sales being made to business customers and that its walk-in business is minimal. (LaRochelle disc. dep. pp.52-53 and 57-59; La Rochelle test. pp.25-27, 42 and 48)  Nonetheless, we must consider channels of trade and classes of consumers based on the identifications in the involved applications and registrations.  Octocom Systems Inc. v. Houston Computers Services Inc., 918 F.2d 937, 16 USPQ2d 1783 (Fed. Cir. 1990).  Applicant's identification of its retail store services is not limited to retailing to other businesses and must be read to encompass retailing to the home user of personal computers as well as the business user.

For related *goods* typically sold at retail to general consumers, the absence of restrictions, in particular identifications, on channels of trade or

classes of consumers, often leads to the conclusion that the *goods* can move in the same channels of trade, i.e., through the same types of stores or resellers, to the same ultimate consumers.  However, as for the respective retail store *services* in this case, the mere fact that opposer and applicant provide such services is not sufficient reason to conclude the services may be offered together.  Each provides these services through its own stores and web sites.  There is nothing in applicant's identification that suggests that its retail store services focusing on computer hardware and software and peripherals would be rendered through a retail store focusing on sporting goods and equipment, apparel and footwear, or vice versa.  In sum, merely because both parties provide retail store services and use similar methods of advertising does not mean that their respective services will be offered to consumers under circumstances and through channels of trade which would create a likelihood of confusion.[14]

---

[14] Of course, there are instances in which different types of services are rendered through retail establishments, as a retailer might contract with any number of businesses to provide, for example, delivery, installation, repair or maintenance services related to the goods it sells in its retail stores.  We do not mean to suggest that goods can move through the same channels of trade but services cannot.  Rather, we make the specific point that retail store services from different

Likewise, while opposer has many different types of goods listed in at least one of its registrations for THE SPORTS AUTHORITY (Reg. No. 2,071,449), and there are no restrictions on channels of trade for those goods, there is nothing in the record to suggest that such goods would move through a retail store focusing on computer hardware, software and peripherals.  Nor would they be distributed through or by an entity providing business consultation services in the computer field.

We find little likelihood for confusion attributable to channels of trade employed by the parties, notwithstanding that there are no restrictions on the involved identifications.  In regard to classes of consumers, the mere fact that both opposer and applicant are presumed to market to general consumers, including businesses and individuals, does not dictate a conclusion that confusion is likely to arise.  There is nothing in the record to establish the overlap in purchasing habits of consumers of computer goods and services and consumers of sporting goods, equipment, apparel and footwear.  We think it a fit subject for judicial notice that purchasers of computer hardware and software also would be purchasers of, at least, footwear and apparel, and

retailers are, almost by definition, provided through different

perhaps sporting goods and equipment.  There is nothing
in the record, however, to suggest that merely because
the same consumer may purchase these items, such consumer
would consider the goods as likely to emanate from the
same source or have the same sponsorship.

     This factor favors applicant.

(4) *The conditions under which and buyers to whom sales
are made, i.e. "impulse" vs. careful, sophisticated
purchasers.*

     Both opposer and applicant run retail stores.
Opposer also acts as a sort of wholesaler insofar as it
sells goods to businesses that will resell them; and
applicant, too, sells some of its goods to smaller
resellers.  Of course, merely because a significant
portion of each party's business is with ultimate
consumers, rather than resellers, it does not
automatically follow that such consumers are impulsive
rather than careful.  The record reveals that the goods
retailed in opposer's stores and via its web site include
a great variety of items in myriad price ranges.
Likewise, applicant's customers for its computer
retailing business may purchase anything from an
expensive package of computer hardware and software to a
relatively inexpensive accessory item.  Neither party can

---

stores.

be said to deal with only one type of consumer.  Rather, it is clear that each markets some goods that might be bought on impulse and others that would require a good deal of deliberation.

The other services each party provides, e.g., applicant's consultation and design services relating to computers and opposer's various services such as advertising, marketing, importing and exporting, promoting sports teams, and sponsoring teams and competitions, would more uniformly require some degree of deliberation before purchase.

This factor favors neither party.

(5) *The fame of the prior mark.*

With this factor, we look at what fame a mark has achieved in the marketplace. "Thus, a mark with extensive public recognition and renown deserves and receives more legal protection than an obscure or weak mark."  Kenner Parker Toys v. Rose Art Industries, 963 F.2d 350, 353, 22 USPQ2d 1453, 1456 (Fed. Cir. 1992).  See also, Recot Inc. v. M.C. Becton, 214 F.3d 1322, 1327, 54 USPQ2d 1894, 1897 ("The fifth *DuPont* factor, fame of the prior mark, when present, plays a 'dominant' role in the process of balancing the *DuPont* factors.")

Opposer has spent a good deal more of its effort on trying to establish that its family of marks is famous than it has spent trying to establish that its two core marks have attained some degree of fame. At this point in our decision, however, we consider the record for its evidence of fame of THE SPORTS AUTHORITY and the TSA logo.

"Achieving fame for a mark in a marketplace where countless symbols clamor for public attention often requires a very distinct mark, enormous advertising investments, and a product of lasting value." *Kenner Parker*, 963 F.2d at 352, 22 USPQ2d at 1456. In this case, opposer's core marks were possessed of at least a high degree of suggestiveness when conceived, but have acquired sufficient distinctiveness to become strong marks. See The Sports Authority, Inc. v. Prime Hospitality Corp., 89 F.3d 955, 39 USPQ2d 1511 (2d Cir. 1996) (In decision vacating grant of summary judgment on other grounds, appeals court noted that the trial court had found THE SPORTS AUTHORITY to be descriptive but possessed of acquired distinctiveness).[15] In addition,

---

[15] By way of contrast with the *Prime* trial court's finding, we note that the Office has registered THE SPORTS AUTHORITY on the Principal Register without requiring a showing of acquired distinctiveness.

42

from the record we know that opposer's investment in advertising grew from $1.2 million in 1988 to nearly $70 million in 1998, the last year for which we have figures. Not included in these totals are the amounts opposer spends when it opens a new store.  During the early and mid-1990s, opposer was opening stores regularly and expanding geographically, so that it now has 200 stores in 32 states and is the largest sporting goods retailer in the country.  Opposer's sales of sports related goods and services and apparel escalated from $3 million in 1987 to nearly $1.6 billion dollars in 1998.

These figures are unquestionably impressive.  Cf. TCPIP Holding Co. v. Haar Communications Inc., 244 F.3d 88, 96, 57 USPQ2d 1971, 1975 (2d Cir. 2001) (footnote omitted) ("Some of the holders of these inherently weak marks are huge companies; as a function of their commercial dominance their marks have become famous.")

On the other hand, we have little, if any, evidence to show the level of brand awareness that has resulted from opposer's expansion and promotional efforts.  There is no survey evidence and we do not have figures regarding household penetration or brand awareness that would tend to establish that opposer provides products and services of lasting value.  For comparison, we note

the evidence of record in the *Kenner Parker* and *Recot* cases:

> In the two- to seven-year-old age group, one in every two children currently owns a PLAY-DOH product. A survey showed that 60% of mothers named PLAY-DOH for modeling compound without any prompting. One witness characterized PLAY-DOH as a "piece of gold" which has lasted over thirty years as a successful toy -- a very unusual occurrence in the toy business.

*Kenner Parker*, 963 F.2d at 351, 22 USPQ2d at 1455.

> Recot … has manufactured and sold a wide variety of snack food under its mark, FRITO-LAY, for over thirty years. Recot now sells FRITO-LAY products nationwide in supermarkets, grocery stores, mass merchandisers, and wholesale clubs, convenience stores, food services, and vending machines. … In any given year, up to 90 percent of American households purchase at least one FRITO-LAY brand snack.

*Recot*, 214 F.3d at 1326, 54 USPQ2d at 1896.

We do not have a similar record in this case. TSAM's witness Lisi, discussing TSAM's core marks, testified that he had "commissioned two separate US valuations by outside valuation expert [sic] and looked at and worked with them and gone through all of the same factors, consumer recognition, you know, who are our competitors, what is their market share, what is our market share, those sorts of things." (Lisi test. p.92)

Yet we have no testimony or reports from the outside valuation expert or experts; not even a statement from Lisi as to the conclusions reached on consumer recognition and market share. Further, Lisi, opposer's chief witness, was equivocal on whether the outside valuations are evidence that TSAM's core marks are famous: "And from that information [i.e., the outside valuations], my personal impression is that the mark The Sports Authority, the mark Sports Authority and design and the family of Authority marks are extremely strong, if not famous." (Lisi test. pp.92-93)

While opposer has introduced a number of its annual reports (Lisi test. exh. 25), and hundreds of pages of financial analyses of opposer by financial analysts (Lisi test. exh. 23), there is no testimony or argument asserting that these materials contain any information on household penetration, brand awareness or brand value. Lisi also identified and introduced an affidavit and accompanying exhibit (Lisi test. exh. 22) intended to establish the number of viewer impressions created by opposer's television advertising over a three-year period; but without testimony from the individual who prepared the exhibit, the Lisi testimony is probative of nothing more than that he received the affidavit and

report from an officer of opposer's ad agency.  Likewise,
Lisi introduced a "master list" of what are reported to
number over 10,000 incidents of "unsolicited" press
coverage of opposer and/or its stores. (Lisi test. exh.
24)  However, no individual articles have been produced
as a sample and we have no idea whether the articles are
positive or negative; we know only that Lisi testified to
their collection.

These failures are significant.  Because "the fame
factor is based on underlying factfinding … relevant
evidence must be submitted in support of a request for
treatment under the fame factor.  This responsibility to
create a factual record is heightened under the more
deferential standard that [the Federal Circuit] must
apply when reviewing PTO factfinding."  Packard Press
Inc. v. Hewlett-Packard Co., 227 F.3d 1352, 1360, 56
USPQ2d 1351, 1356 (Fed. Cir. 2000)(citations omitted).
Opposer has not created a record on which we could find
that its marks have attained the same level of fame as
PLAY-DOH or FRITO-LAY.

As the largest sports retailer in the country and
given the significant sums spent on advertising, almost
all of which involves at least opposer's core THE SPORTS
AUTHORITY mark and TSA logo, we conclude that there is

some degree of fame that attaches to these marks.  Fame is relative, however, not absolute, and we do not put opposer's marks on a par with the marks in *Kenner Parker* and *Recot*.

Nonetheless, the fame factor favors opposer.

(6) *The number and nature of similar marks in use on similar goods.*

With its notice of reliance, applicant introduced evidence of 41 third-party registrations that include the word "Authority" in a mark or slogan.  We immediately discount 15 of these as having little, if any, probative value, for they cover marks where "Authority" is the entire mark, or appears in a slogan not in the same form as the marks of applicant and opposer, or they relate to "authorities" in the nature of public agencies.

Of the 26 remaining registrations, 23 are for words alone and in the "_____ Authority" form, some with a leading "The," others without it.  Even the three registered marks with design elements include wording that would be read in the "_____ Authority" form. These 26 registrations include the following:  ABC AUTHORITY for a web site providing information about "activity-based business management"; HIRE AUTHORITY for "employment agency services"; THE UNDERWATER AUTHORITY

47

("underwater" disclaimed), registered as a service mark in three classes for a wide variety of services provided in or under water, including construction, salvage, inspection, and engineering, among others; AUDIO AUTHORITY (and stylized AA design) ("audio" disclaimed) for items of audio visual equipment and display units and for custom design of display units and audio visual fixtures; LCI AUTHORITY for telecommunications and computer network-related services; COMPUTER SYSTEMS AUTHORITY ("computer systems" disclaimed) for various computer consulting and technical support services; PORT AUTHORITY for "microprocessor and electronic switching control devices"; POWER AUTHORITY for "surge protectors"; ROUTE AUTHORITY for hand-held, microprocessor-based devices for collecting and transferring data to personal computers; two registrations for THE AEC AUTHORITY (one in design form; both with "aec" disclaimed) for computer software for use in computer-aided design and engineering; THE DIAMOND AUTHORITY ("diamond" disclaimed) for retail jewelry store services; THE CLEANING AUTHORITY ("cleaning" disclaimed) for residential and building cleaning services; AMERICA'S TRAVEL AUTHORITY for computer software for retrieval and display of geographic, routing and travel information; DIRECT

48

AUTHORITY for credit card services; THE HOME IMPROVEMENT AUTHORITY ("home improvement" disclaimed) for a monthly magazine on home improvement and repair; THE CODE AUTHORITY ("code" disclaimed) for publications in the field of product safety testing and certification, building codes, and commercial and residential construction; THE CRUISE AUTHORITY ("cruise" disclaimed) for a travel agency specializing in cruises; THE ULTIMATE AUTHORITY for magazines for collectors of stuffed toy animals and dolls; THE AIR AUTHORITY ("air" disclaimed) for environmental consulting; NATIONAL AUTO AUTHORITY and design, with smaller slogan "Pre-Purchase Inspection Services" ("NATIONAL AUTO" and slogan disclaimed) for used car inspection services; MONITOR AUTHORITY ("monitor" disclaimed) for electronic home entertainment systems and components; two registrations for THE INTERNET PERFORMANCE AUTHORITY ("Internet performance" disclaimed in each) for "computer software for measuring, monitoring, and improving" quality of service of the Internet and other networks, and for services related thereto; PARTS AUTHORITY ("parts" disclaimed) for retail store services and distributorship services dealing in automobile parts, supplies and accessories; and THE LIGHTING AUTHORITY ("lighting" disclaimed) for

49

"association services, namely promoting the art and science of illuminating engineering."[16]

Applicant has also introduced, via the LaRochelle testimony deposition, reprints of numerous web pages that feature various marks including the term "Authority." Many of these web pages appear to be web sites posted by the owners of certain registrations referenced above, e.g., THE UNDERWATER AUTHORITY, THE ABC AUTHORITY, THE CODE AUTHORITY, AUDIO AUTHORITY, PARTS AUTHORITY, LCI AUTHORITY, COMPUTER SYSTEMS AUTHORITY. Some other web pages include identical, or nearly identical, marks as some of those in the registrations referenced above, but appear to have been posted by entities other than the owners of the corresponding registrations, e.g., CRUISE AUTHORITY, THE DIAMOND AUTHORITY, HIRE AUTHORITY, AIR AUTHORITY INCORPORATED, and THE CLEANING AUTHORITY. Finally, there are web pages featuring "_____ AUTHORITY" marks unlike any of the registrations referenced above, e.g., THE JEANS AUTHORITY, THE COLOR AUTHORITY, THE PAYMENTS AUTHORITY, THE AUTO AUTHORITY, THE TRAVEL AUTHORITY, THE LEARNING AUTHORITY, SALES AUTHORITY, HEATING AUTHORITY, THE WINE AUTHORITY, MOBILE

---

[16] Each of the third-party registrations issued based on use of the mark in commerce, and some have been maintained through the filing of affidavits of use under Section 8 of the Lanham Act.

AUTHORITY, FLEET AUTHORITY, THE INSURANCE AUTHORITY, THE HEALTH AUTHORITY, and THE STORAGE AUTHORITY.

The last block of evidence intended by applicant to demonstrate widespread use and adoption of "_____ AUTHORITY" marks consists of the LaRochelle search of BIG YELLOW, an on-line yellow pages directory. By this last block of evidence, applicant attempts to establish that there are numerous -- thousands, even -- businesses listed in BIG YELLOW which have "Authority" in their names. By the testimony of Clifford Sewing, we know that BIG YELLOW has been available over the Internet since 1996 and its listings are compiled from approximately 4500 yellow page directories from across the country. Sewing also testified that 13 million searches of the data base are conducted each month and 10-20 percent of these are searches seeking listings for businesses with particular names or terms, rather than all listings within a whole category or information corresponding to a particular phone number. In regard to the search conducted by LaRochelle, Sewing testified, "It appears that the search is giving matching categories -- the database found 14,161 business listings and 781 categories with the name authority in it. So there's

14,000 plus businesses with the name authority across the country."

Most of the BIG YELLOW listings are not relevant, because they are for "authorities" in the nature of public agencies, such as the "Holmes County Economic Development Authority" or the "Grand Rapids Area Transit Authority."  Many others, however, follow the "_____ Authority" pattern and appear to be businesses attempting to present themselves as "authorities" in their fields, e.g., "The Entertainment Authority," "Sports Car Authority," "Auto Lease Authority," "Hair Authority," "Boat Authority," "CD Authority," "Hire Authority," "Nanny Authority," "Glass Authority," "Coupon Authority," "Design Authority," "Gem Authority," "Landscaping Authority," "Fence Authority," "Kickboxing Authority," "Moving Authority," "Pet Authority," "Plumbing Authority," "Vinyl Authority," "Chicago Bagels Authority," "Pizza Transit Authority," "Roof Authority," "Storage Authority," "Cruise Authority," "Travel Authority," "The Wine Authority," "Tuxedo Authority," "Wedding Authority," "Resume Authority," and "The Office Authority."

Opposer discounts much of the evidence of third-party registrations, web sites, and BIG YELLOW trade name listings.

In regard to the third-party registrations, opposer's witness Lisi, in his rebuttal testimony, argues that TSAM has actually taken assignments of one or two of the registered marks; that it has investigated the actual use of some of the registered marks and entered into co-existence agreements with the registrants; that it monitors other uses; and that opposer takes enforcement actions ranging from issuing cease and desist letters to filing civil lawsuits for uses to which it objects. The Lisi testimony also reveals that opposer does not have co-existence agreements with all users of "_____ Authority" marks, cannot afford to challenge all uses, and must "prioritize who we pursue or what we pursue and often that's determined by the severity of the problem and what's already being handled at a given time. …we do the best we can with the resources we have." (Lisi rebuttal test. pp.4-11) Similarly, in regard to web sites on which applicant relies, the Lisi rebuttal testimony makes clear that opposer has been in contact with some of the entities behind the web sites. (Lisi rebuttal test. pp.12-23)

Opposer argues that neither the third-party registrations nor the Internet web sites are evidence of use of the marks shown therein. Yet the Lisi rebuttal testimony confirms that many of the registered marks and web sites have been put to some use, because opposer investigated the uses, in some instances, consented to particular uses, and in others monitors ongoing use.

It is well settled that third-party registrations are not evidence of use of the marks shown therein, or that consumers have been exposed to them. AMF Inc. v. American Leisure Products, Inc., 474 F.2d 1403, 1406, 177 USPQ 268, 269 (CCPA 1973). Likewise, the Internet web sites and BIG YELLOW listings are of limited probative value. Cf. *AMF Inc.*, 474 F.2d at 1406, 177 USPQ at 270 ("We think the listing of trademarks … in various trade magazines should be treated in a similar manner as are third-party registrations. They give no indication as to actual sales, when the mark was adopted, customer familiarity with the marks, etc.") citing Gravel Cologne, Inc. v. Lawrence Palmer, Inc., 469 F.2d 1397, 176 USPQ 123 (CCPA 1972). Nonetheless, we find the numerous registrations and web site uses probative evidence that marks using a descriptive or suggestive term followed by the term "Authority" are attractive to many businesses,

are adopted to convey the very suggestive connotation that the adopting entity is an expert or authority in the particular field in which it is engaged, and that such marks often co-exist[17] and are distinguished because of the other terms used in conjunction with "Authority." See Henry Siegel Co. v. M & R Mfg. Co., 4 USPQ2d 1154, 1161 n. 11 (TTAB 1987) and Bost Bakery, Inc. v. Roland Industries, Inc., 216 USPQ 799, 801 n. 6 (TTAB 1982).

This factor favors applicant.

(7) *The nature and extent of any actual confusion.*

There is no evidence of actual confusion in this case. TSAM's witness Meyers testified that one customer in opposer's Manchester, New Hampshire store asked whether a computer shown in a display with a global positioning system could be purchased. This does not evidence confusion between the party's respective businesses. The absence of actual confusion is a factor that favors applicant.

(8) *The length of time during and conditions under which there has been concurrent use without evidence of actual confusion.*

Opposer has had one of its retail stores located in Manchester, New Hampshire since prior to applicant's

---

[17] In regard to the ability of at least some of such businesses to co-exist, we note again that TSAM's witness Lisi has

adoption of its marks.  By the time of trial, the parties had concurrently operated in the same geographic market for approximately five years without any evidence of actual confusion.  This factor favors applicant.

(9) *The variety of goods on which a mark is or is not used (house mark, "family" mark, product mark).*

Applicant uses THE PERSONAL COMPUTER AUTHORITY as a trade name and uses THE PERSONAL COMPUTER AUTHORITY and the PC AUTHORITY logo as house marks for its retail store services and business consultation services focusing on computers.  Opposer has obtained 4 registrations for the words THE SPORTS AUTHORITY, one registration for the TSA logo and another for THE SPORTS AUTHORITY LTD.  THE SPORTS AUTHORITY is utilized as opposer's trade name and both THE SPORTS AUTHORITY and the TSA logo are utilized as house marks for various goods and services relating to sports and apparel.

Because the respective marks are utilized as the parties' respective house marks, this factor slightly favors opposer, notwithstanding that the parties' goods and services are very different.

(10) *The market interface between applicant and the owner of a prior mark:*
    *(a) a mere "consent" to register or use.*

_____

testified on this point.

*(b) agreement provisions designed to preclude confusion, i.e. limitations on continued use of the marks by each party.*
*(c) assignment of mark, application, registration and good will of the related business.*
*(d) laches and estoppel attributable to owner of prior mark and indicative of lack of confusion.*

This factor is not an issue in this case.

(11) *The extent to which applicant has a right to exclude others from use of its mark on its goods.*

There is no evidence on this factor.

(12) *The extent of potential confusion, i.e., whether de minimis or substantial.*

Opposer argues that the risk of potential confusion is great. Yet the parties' respective marks convey different specific commercial impressions, the parties have operated their retail establishments within miles of each other for approximately five years, the parties provide their respective consumers with very different goods and services, and there have been no known instances of actual confusion. While opposer's witness Lisi testified about possible expansion into marketing of more hand-held type electronic devices with embedded computer chips, we find the testimony vague and insufficient to evidence any genuine intent of opposer to bridge the gap between the parties. We conclude the extent of potential confusion is de minimis.

57

This factor favors applicant.

(13) *Any other established fact probative of the effect of use.*

Opposer notes that it has been quite aggressive in investigating and, often, challenging other uses of "Authority" marks. Despite applicant's request that we disregard the table of enforcement actions presented in opposer's brief, even without resort to that table, the record clearly supports the conclusion that opposer has regularly ridden into battle against other "Authority" marks. While opposer has had many successes, these do not appear to have diminished the attractiveness of such marks to others. Further, TSAM witness Lisi admitted that it does not maintain a chart of uses of "Authority" marks that it does not find objectionable and has not challenged. Thus, the record does not allow us to accurately assess the percentage of potential conflicts opposer has risen to challenge.

This factor favors neither party.

Balancing of the DuPont Factors

By balancing the *duPont* factors, we conclude that there is no likelihood of confusion in this case.

Likelihood of confusion is decided upon the facts of each case. In re Dixie Restaurants, Inc. 105 F.3d 1405,

1406, 41 USPQ2d 1531, 1533 (Fed. Cir. 1997); *Shell Oil*, 992 F.2d at 1206, 26 USPQ at 1688 (Fed. Cir. 1993). The various factors may play more or less weighty roles in any particular determination of likelihood of confusion. *duPont*, 476 F.2d at 1361, 177 USPQ at 567.

We note that the balance must initially tip in opposer's favor, because the Federal Circuit "has acknowledged that fame of the prior mark … 'plays a dominant role in cases featuring a famous or strong mark.'" Century 21 Real Estate Corp. v. Century Life of America, 970 F.2d 874, 877, 23 USPQ2d 1698, 1701 (Fed. Cir. 1992), *quoting*, *Kenner Parker*, 963 F.2d at 352, 22 USPQ2d at 1456. In addition, the Federal Circuit has held that in a particular case, a single *duPont* factor may be dispositive. Kellogg Co. v. Pack'em Enterprises Inc., 951 F.2d 330, 21 USPQ2d 1142, 1145 (Fed. Cir. 1991).

We do not find this case an appropriate one in which to rule that the presumptive fame of opposer's mark alone can be a dispositive factor. That fame is presumed to attach to opposer's core marks solely because of sales and advertising figures. The record is, however, insufficient to establish that opposer's core marks are in the same class of marks as are PLAY-DOH and FRITO-LAY,

59

which were the marks in, respectively, the *Kenner Parker*
and *Recot* decisions.  Even in those cases, where the
record supporting the fame factor was greater, there were
other *duPont* factors favoring the opposers.  In this
case, the only other *duPont* factor that favors opposer is
the ninth, and that only slightly.

On the other side of the balance, the first, second,
third, sixth, seventh, eighth and twelfth *duPont* factors
favor applicant.[18]  The first and second are often key
considerations.  See Federated Foods, Inc. v. Fort Howard
Paper Co., 544 F.2d 1098, 192 USPQ 24 (CCPA 1976).  See
also, *Kellogg*, *supra*, wherein the first factor alone was
determinative.

In this case, though the balance initially tips in
favor of opposer because of the fame factor, the many
other factors that weigh in the balance in favor of
applicant are sufficient to overcome the fame factor.
Moreover, opposer has produced no evidence that the
relevant public, i.e., consumers of diverse retail store
services, has become accustomed to seeing the same or
similar marks in connection with the operation of retail
stores in fields as diverse as sports and apparel, on the

---

[18] The fourth, tenth and eleventh factors favor neither party.

one hand, and computer hardware, software and accessories on the other.

We find no likelihood of confusion among consumers when comparing opposer's marks THE SPORTS AUTHORITY and the TSA logo with applicant's marks THE PERSONAL COMPUTER AUTHORITY and the PC AUTHORITY logo.  We note also, that comparison of applicant's marks with opposer's other registered marks does not yield any greater basis on which to find a likelihood of confusion.  None of those marks benefits from the fame of opposer's core marks and they are no more similar to applicant's marks than opposer's core marks.

**TSAM's FAMILY OF MARKS CLAIM**

As noted, the record is clear that opposer makes consistent and widespread use of its core marks, THE SPORTS AUTHORITY and the TSA logo.  Also, as discussed above, priority of use is not an issue in this case, insofar as these and other registered marks of opposer are concerned.  See *King Candy*, *supra*.  In regard, however, to opposer's claim that it has a family of marks, opposer cannot show merely that it has a number of registrations with a common term, but must show that use of marks sharing "a recognizable common characteristic"

61

predates applicant's first use of its marks and is made in such a way as to create "recognition among the purchasing public that the common characteristic is indicative of a common origin of the goods." J & J Snack Foods Corp. v. McDonald's Corp., 932 F.2d 1460, 1462, 18 USPQ2d 1889, 1891 (Fed. Cir. 1991).

Opposer has denied "any use of the term Authority that any entity may come up with … would infringe upon [TSAM's] family of marks." (Lisi disc. dep. pp.40-41) Thus, it is clear that opposer does not claim rights in gross to the term "Authority." Opposer has described its asserted family as "all formed by the dominant surname AUTHORITY and most of which begin with a highly suggestive prefix…" (TSAM Brief p.2) TSAM's witness Lisi, in his discovery deposition, stated that "the core mark, father or mother mark is the mark Authority." (Lisi discovery dep. p.40) In its reply brief, however, TSAM echoes the main brief and asserts that its family is "anchored by its centerpiece trade name THE SPORTS AUTHORITY" and most members of the family include "a descriptive or suggestive word preceding the AUTHORITY family surname." (TSAM reply brief p.1) Though opposer's oldest registration is for the mark AUTHORITY alone -- for apparel -- this was registered prior to

opposer's formation and obtained by assignment.  We find the description of TSAM's family in its brief more apt than the Lisi statement.

The progenitors of opposer's family clearly are its mark THE SPORTS AUTHORITY and THE SPORTS AUTHORITY logo. The "recognizable common characteristic" of marks used and/or registered by opposer, and which are, therefore, members of its family, is a mark format wherein one or more words, e.g., "Golf," "Tennis," "Golf & Tennis," "Fishing," "Marine," "Basketball," "Footwear," "Outdoor," "Bag," "Shoe & Apparel," and "Back to School," are used in conjunction with, and as adjectives modifying, the term "Authority."  The testimony of TSAM's witness Lisi, and exhibits 3 and 37 thereto, which are samples of print advertisements for opposer's stores in which the core marks and other marks sharing the family characteristic are presented, demonstrate the formation of the family prior to applicant's first use of its marks.[19]

Many of the ads in Lisi exhibit 3 also feature use of slogans such as "We're the Authority on In-Line Skates and Apparel" or "We're the Authority on Great Athletic Footwear!"  Slogans such as these, however, are in ads

---

[19] Occasionally, the ads show family members in a "THE _____ AUTHORITY" format.  We do not view the presence or absence of "the" as a critical family characteristic.

dated after applicant's first use of its mark, and do not share the same "recognizable common characteristic" as the family established prior to applicant's first use. We do not consider these slogans to be part of the family established prior to applicant's first use. To the extent these slogans may evidence opposer's attempt to create a new and different family other than the one we have recognized, they do not aid opposer in this case.

   Nor do we consider opposer's registered mark AUTHORITY or marks such as AUTHORITY PRICE or the slogan "Come to the Authority on holiday savings" to be part of the family. The evidence of record of use of such marks is scant compared to the evidence of use of the "_____ AUTHORITY" marks.[20]

---

[20] Opposer asserts in its brief, more specifically, in its description of the record, that its "advertising efforts have been very successful in creating hundreds of billions of consumer impressions and establishing links in the minds of consumers between" opposer's goods and services and its family of marks. (TSAM brief pp.8-9)  There is, however, no support in the record for such an assertion. *(cont.)*

  TSAM's witness Lisi testified that opposer's web site "had over a billion click throughs from Yahoo alone in the [1999] Christmas selling season…." (Lisi test. p.67)  He also testified "that there are billions and billions of new impressions being created for the Authority marks through the Internet venue…." (Lisi test. p.70)  Yet there is no independent support for these statements and, in any event, the only exhibits that correspond to this testimony show use of only TSAM's two core marks, of THE AUCTION AUTHORITY, and of a slogan that reads "The Ultimate Authority for Selection, Quality, and Value."  In short there is no evidence that TSAM's web site has created either the number of advertising impressions trumpeted in opposer's brief or of an

While we find that opposer has promoted its "_____ Authority" marks as a family, we acknowledge applicant's argument that the family surname is weak and non-distinctive. (PCA brief p.12)  Likewise, we acknowledge applicant's contention that opposer has presented no evidence, such as a survey, demonstrating public recognition of the family. (PCA brief p.15)  Finally, we acknowledge applicant's contention that the advertisements in Lisi testimony exhibits 3 and 37 include none dated, respectively, after August 1997 and May 1995, and applicant's charge that opposer's advertising of its family of marks "has long since expired." (PCA brief p.16)[21]  Thus, this is not a case quite the same as <u>Han Beauty Inc. v. Alberto-Culver Co.</u>,

association between opposer's goods and services and the various family members shown in the print advertisements introduced by the Lisi deposition.

   The Lisi testimony deposition also was used to introduce, as exhibit 22, two affidavits.  One is from an officer of TSAM's advertising agency and is intended to establish that from 1990-92, there were approximately one and a quarter billion viewer impressions of opposer's television advertising.  We have already noted, in our discussion of the fame of opposer's core marks, that this affidavit and its exhibit are not probative evidence.  Moreover, even if we had found the affidavit and exhibit to be probative evidence, the affidavit and its exhibit do not establish either the level of viewer impressions described in opposer's brief or that such impressions related to promotion of opposer's family, as opposed to its core marks.

[21] Applicant has also contended that the number of marks in opposer's family can number no more than five, because only five of its marks were registered prior to applicant's first use.  Applicant is legally incorrect on this point.

236 F.3d 1333, 57 USPQ2d 1557 (Fed. Cir. 2001). In that case, the defendant stipulated before the Board that plaintiff had a family of marks without "temporal or other limitation." *Id.* 236 F.3d at 1336, 57 USPQ2d at 1559. Here, defendant clearly contests recognition and distinctiveness of plaintiff's family characteristic.

Applicant is correct in arguing that distinctiveness of the family characteristic is a factor to be considered. *J & J Snack Foods*, *supra*, 932 F.2d at 1463, 18 USPQ2d at 1891-92 ("It is thus necessary to consider the use, advertisement, and distinctiveness of the marks, including assessment of the contribution of the common feature to the recognition of the marks as of common origin.")

In this regard, opposer contends that many of the members of its family are registered, on the Principal Register, without resort to Section 2(f) of the Lanham Act, and some have attained incontestable status. Opposer also relies on its extensive advertising and an "incredible volume of unsolicited articles written about TSAM by the press" to establish the strength of its family. Thus, opposer considers its family not merely

66

presumptively strong but also famous. (TSAM brief pp.26-
28)

We believe the record indicates that the strength of
TSAM's family of marks is rather limited.  We begin our
consideration of the family's strength with the
observation that the marks in the family are highly
suggestive.  TSAM has admitted that each mark in the
family utilizes a suggestive or descriptive term as a
modifier of the term "Authority."  The term "Authority,"
too, is highly suggestive when used as part of a series
of marks for retail store services, in that the term
readily suggests that TSAM can provide customers
"authoritative" assistance.  Thus, the family
characteristic readily suggests that the stores owned and
operated by TSAM and those stores licensed to use its
marks, are staffed by authorities in selecting the types
of goods, or preparing consumers for the types of
activities, that are referenced in the marks in its
family.

We also note that, in the record, the family members
play feature roles only in Lisi testimony deposition
exhibits 3 and 37 and, even then, there is no evidence of
promotion of the family in print ads after August 1997.[22]

---

[22] The Lisi testimony deposition was taken March 9, 2000.

67

The family members do not appear at all in the transcripts of radio advertising (Lisi test. exh. 19); or in the photographs and exhibits which demonstrate use of TSAM's two core marks at athletic arenas and public displays at sports events (Lisi test. exhs. 9 & 10); or in the web pages from TSAM's web site (Lisi test. exh. 18); or in the catalogues, flyers and other print material submitted as Lisi testimony exhibits 20, 21, 34 and 35. In addition, PCA's testimony witness LaRochelle authenticated and introduced five of TSAM's flyers (LaRochelle test. exhs. 12-16) he received at his home, and none of these includes any members of the family other than TSAM's two core marks. Finally, TSAM's witnesses, Lisi and Meyers, could testify to use in the Manchester, New Hampshire THE SPORTS AUTHORITY store of only two other members of the family, besides the two core marks, specifically KNIFE AUTHORITY and SKI AUTHORITY; even then, the Meyers testimony is vague, as he only recalled the use of SKI AUTHORITY during re-direct testimony.

Moreover, while opposer has made an unsupported assertion that the record shows there have been "hundreds of billions" of consumer impressions of its family because of advertising, all the record reveals is a round

figure spent on advertising, on an annual basis, and does not in any way show that such expenditures were for ads featuring family members, as opposed to TSAM's two core marks. The sales and advertising figures, to be sure, are impressive. Yet there is no evidence they have translated into recognition of TSAM's family of marks.

In short, we find that the record shows that TSAM's family of marks was formed prior to applicant's first use, but its members are not now seen together in public very often and, therefore, the family possesses very limited strength. Certainly, we do not find support for opposer's argument that its family of marks, as opposed to its core marks, is famous. Moreover, any strength attaching to TSAM's family of "_____ AUTHORITY" marks is further limited to the retailing of sporting goods and equipment, footwear, apparel and the like. There is nothing in the record to support a conclusion that the family would be recognized as extending beyond such goods and services. Cf. *Han Beauty*, 236 F.3d 1333, 57 USPQ2d 1557 (Fed. Cir. 2001) (Applicant's mark for hair care products would be perceived as indicating applicant's goods have common origin with opposer's hair care products marketed under family of similar marks); *J & J Snack Foods*, 932 F.2d 1460, 18 USPQ2d 1889 (Fed. Cir.

1991) (Applicant's marks for frozen soft pretzels would be perceived as indicating applicant's goods have common origin with opposer's wide variety of food products marketed under family of similar marks); and Motorola, Inc. v. Griffiths Electronics, Inc., 317 F.2d 397, 137 USPQ 551 (CCPA 1963) (Applicant's mark for electron gun used in television tubes and other electronic devices "would appear to many to be a member of opposer's family" of similar marks, where parties "obviously in the same general field.").

In terms of likelihood of confusion, we find that the *duPont* factors are balanced almost exactly the same when we compare TSAM's family and applicant's marks, as they were when we compared TSAM's core marks and applicant's mark; except that the fifth *duPont* factor, fame, does not favor opposer. Thus, under the circumstances presented by this case, we find no likelihood of confusion between TSAM's family of "_____ AUTHORITY" marks and applicant's marks THE PERSONAL COMPUTER AUTHORITY and the PC AUTHORITY logo.

**DECISION**

The opposition is dismissed as to each of applicant's involved applications.